May it please the Court, I'm Jessica Taylor and I'm appearing on behalf of Appellant LaShondra Davis. We are asking in this case that your honors reverse the summary of the summary judgment introduced by the District Court in favor of Aetna. A review of the administrative record in this case reveals that when Aetna began investigating whether Davis was entitled to benefits under the Any Reasonable Occupation definition of disability, it set out with a course of conduct of the goal of refuting the opinions of her treating physician, Dr. Cheatham, who had repeatedly and adamantly opined that she had restrictions and limitations preventing her from doing a sedentary job. And the actions that Aetna took are evidence of procedural unreasonableness, which would give this court the right to give Aetna's decision in this case less deference, but are also evidence of an abuse of a discretion. First, Aetna actively sought evidence to discredit both the opinions of Dr. Cheatham and Dr. Crane, the doctor it hired to do an independent medical examination of Davis. A nurse who reviewed Davis's claim when it started its investigation of the test change made a point of putting in the record that any sort of clinical outreach to Dr. Cheatham would not be beneficial at all because he historically and adamantly supported her. So the nurse recommended that Aetna schedule an IME for Davis. When that IME doctor, Dr. Crane, essentially reached the same conclusions Dr. Cheatham had for a couple of years, Aetna then turned to a fraud investigation where they reviewed her husband's Facebook posts and conducted surveillance of her, which was very limited. The total time the investigator followed her was less than two hours, and he only captured about 16 or 17 minutes of her activities on video. Then, while deemphasizing the opinions of Dr. Cheatham... It's sort of customary after a period of time to begin to investigate further, investigate further to make sure somebody doesn't claim disability forever when the disability has ceased or whatever. Correct. I mean, I would not say that it is a rare circumstance that a disability insurer would do surveillance, say, at a test change. But the question is, you know, the whole mindset behind trying to find any evidence whatsoever to discredit the opinions of her treating physician, you know, should come into play here. And also, their surveillance here was of very limited value. It did not show Davis performing any activities that were inconsistent about her statements of her level of activity, nor was she shown performing any activities that were contradictory to Dr. Cheatham's restrictions or limitations, and certainly it was not evidence that she could work a full-time job 40 hours a day. I'm sorry. Go ahead. Even without the surveillance, don't you have two doctors a year after Dr. Crane who review the records and determine that she's not disabled, at least from any occupation versus her own, that she could do something sedentary? Yes, and that's correct. And as I was going to get to this point, that while they were trying to discredit the treating physician and the IME doctor, they heavily relied on the opinions of Dr. Braun, who did the peer review before the initial denial of the claim, and then Dr. Iyer, who did the review during the appeal. I won't discuss the problems with Dr. Braun's report so much, because had Aetna had a very solid opinion from a peer review physician on appeal, you know, based on the case law, any problems with Dr. Braun's report would be excused. But here, although Aetna provided more information to Dr. Iyer than it had provided to Dr. Braun, it still did not provide all the relevant medical records, including the physical capabilities limitations worksheets Dr. Cheatham had filled out, where he repeatedly gave her restrictions and limitations inconsistent with doing sedentary work. And also, despite the list of the exhaustive medical records Aetna did provide him, he reviewed and analyzed very few of those records. For example, he only discussed four of Dr. Cheatham's office visit notes. He only discussed one out of 14 lab test results. In reviewing those records, he said that the physical exam findings and the lab test results were essentially normal. So then he relied heavily on the surveillance video to say, well, this is evidence she has no restrictions or limitations at all. And in the conclusion of his report, he made a point of saying there was no evidence of... Are you talking about Dr. Iyer? Dr. Iyer, yes. I thought Dr. Iyer was a she. Was I wrong on that? It's a he? Okay. You know, I'm not quite sure. It's fine. I just want to be sure we're talking about Dr. Iyer. I know that Aetna called... I think I looked up the first name and concluded it was male. I'm not sure. That's fine. I'm not... It may be relevant to Dr. Iyer. It's not relevant to me. I just wanted to make sure we're talking about the same person. Yes, Dr. Iyer. Okay. And so his or her, you know, final conclusion was there was absolutely no joint deformities, musculoskeletal deformities or serologic deformities in Davis's medical record, when in fact there was a very large volume of medical records, lab test results, office visit notes, attending physician's statements, the worksheets that in fact supported her disability. And also, Aetna had another peer review that was performed early on by a rheumatologist, not an occupational medicine physician like Dr. Iyer. And she essentially commented that, you know, Dr. Cheatham was right, that she had very severe restrictions and limitations. And in fact, she thought, you know, it could be that Davis was permanently disabled. You know, and then you also have the IME report where the doctor actually met Davis, examined her, and she, you know, and he came to the conclusion that Dr. Cheatham's opinions about her restrictions and limitations were valid. But isn't the problem the standard of review that I think there's some evidence to support your argument that she is permanently disabled, but there's also, Aetna says, some argument to support the idea that she can do sedentary work. And in that, a situation where you can't win in this court? Well, I would agree, practicing law on this side, that the standard of review under ERISA normally is very, you know, it's a disadvantage for claimants. But here, and under the Supreme Court's decision in Glenn, you know, there are factors present in addition to Aetna's structural conflict of interest that show that that conflict affected the way Aetna investigated the claim. Was there evidence that either of these two, Braun or IR, like, always find somebody's not disabled or have some, that there's some question about their, you know, veracity, if you will? I mean, unfortunately, you know, we didn't have discovery that would prove that point. But I think their analysis of the medical records and then the opinions they reached, which they could not have reached if they had actually reviewed and analyzed all the medical records, I think that alone is evidence of procedural unreasonableness. Now, I may not have, you know, statistics that show that Dr. IR, 95% of the time, finds that claimants are not disabled for Aetna. No, I do not have that. But I think that there are serious, unexplained gaps, lack of any rational connection between the actual medical evidence in the file and the conclusions both Dr. Braun and Dr. IR reached that there was no objective medical evidence at all in any way that supported any restrictions or limitations. What do you do with the Social Security? I can't get a word. Well, so it's interesting, you know, during the initial claim review, Aetna made a point of telling Dr. Braun that the administrative law judge had denied Social Security, which he included in the records he reviewed informing his opinions. That did not happen with Dr. IR. You know, in the briefing in this case and then also the district court's opinion, however, there are arguments that that denial of Social Security is a very relevant fact to whether Aetna abused its discretion. Well, that's wrong. I mean, the case that the district court cited to as evidence that it was relevant evidence, in fact, says the contrary, that the award of Social Security benefits is relevant evidence that the administrator has to consider because since there is a stricter standard under Social Security to get disability benefits than it is in typically a, you know, insurance, disability insurance policy or like the case here, the fact that she may not have met this broader definition of disability is not evidence here. And there's case law that says, you know, a denial of benefits is of very little relevance, and there's also a district court opinion that says that the administrator can rely on a denial of Social Security as a reason to conduct further investigation in the case, but it can't be the basis for their decision. They have to have other evidence. Did I understand you to say this was a fraud investigation? So, well, I say fraud. Aetna referred her claim to its risk management unit, and it's unclear what sort of red flag popped up that caused her claim to be referred. There was a social media review that pulled up her LinkedIn profile, and on her LinkedIn profile it said she was taking courses at North Central University, an online course, and then from there, that's when they did a more, a broader social media review and found her husband's Facebook page. And the value of anything on her husband's Facebook page is somehow evidence of her activities, you know, certainly is something the parties contest. I think it's a little evidence. And then it also caused them to do the surveillance on her. Was it not the finding out about the SSDI determination that prompted the investigation? That happened around the same time. I think it's kind of unclear. But you are right, it may be, you know, finding out about that decision prompted the investigation. That would not be unreasonable. No, not necessarily. Okay, so you find out that she's been denied disability benefits by some governmental entity, and therefore you dig a little deeper. Right. That's a little different spin than the original point where you said they're trying to just undermine Dr. Crane. It was actually a year before. Right. I mean, but at that same time of the denial, you know, by the administrative law judge, you know, there's a question as to how much value Dr. Crane's opinion actually had. Because despite the fact that Ed did not give him any specific instructions on how to conduct his IME, after the fact, when he gave them an unfavorable opinion, they criticized him for not doing any specific functional testing. So, but I mean, I would submit that, you know, if it was only the administrative law judge's decision that caused the fraud investigation, there was nothing obtained in the fraud investigation that would support the fact that she had no restrictions or limitations at all. Well, then I didn't find that. They're not going to go have her be a stevedore or something like that. They're saying she can do sedentary work. That's different from saying there's no restrictions at all. Right. I think the fact, you know, of the total time they observed her doing short errands, going through the drive-thru of fast food restaurants, going through the drive-thru of a pharmacy, walking with her son into a city hall, you know, sitting in her car for short periods, you know, driving short distances, that in no way shows that she can do a sedentary job 40 hours a week. You know, like Dr. Cheatham said, she was restricted from doing any sort of prolonged sitting, standing or walking. He limited, you know, the amount she could carry. There is nothing on that surveillance that in any way contradicts that. And, in fact, there is case law that says, you know, if you have surveillance of a claimant for very brief periods, that that, unless they're doing some activity beyond their description of what their restrictions are or the treating physicians, that that is in no way evidence of an ability to do a full-time job. But, I mean, if the surveillance was improperly considered, is the answer that we then find benefits in your favor or that we remand to consider without the surveillance? Because it seems like there's still evidence to support what the administrator did, even without the surveillance, because you have these two doctors. But I would argue that the opinion of the two doctors is not very good evidence. It's not substantial evidence that she is not disabled, where they both analyzed very few of her medical records. They cherry-picked statements they thought were favorable from the few records they did review. And in reaching these broad, sweeping conclusions that there's no medical evidence at all, they obviously were ignoring, you know, a good amount of evidence that showed, you know, that she did, in fact, have objective evidence of her disability. And in any case, you know, HEDNA never gave much credence to Davis' subjective complaints regarding her chronic fatigue, regarding her pain. They really made no mention of the fact that Dr. Cheatham repeatedly recorded this in their records. You know, and that's a problem. I think the peer-reviewed physicians' opinions alone are not substantial evidence that she's not disabled. And because HEDNA wholesale relied on those opinions, I mean, that's not only procedurally unreasonable, but it's also evidence of an abuse of discretion. So I would say even if we don't take the surveillance into account, they really don't, and I understand the standard is very favorable for HEDNA, they do not have any sort of substantial evidence to support their opinion. You know, under Glenn, this Court really hasn't analyzed the existence of factors other than the Social Security decision, but there are cases of Ninth Circuit opinion in a case called Monture v. Hartford. In fact, you, Your Honor, drafted an opinion in a case called Hagan, where, you know, there are different factors put forward about what could be procedurally unreasonable. In Hagan, you did not find for the claimant and said they had no evidence. But in any case, I think there's enough evidence for the Court to find that this decision was unreasonable. Thank you, Ms. Taylor. You'll have three minutes on rebuttal. Ms. Courtney Hill. Good morning, Your Honors. May it please the Court. Courtney Hill on behalf of Appellee HEDNA Life Insurance Company. The District Court's decision holding that HEDNA's termination of appellant's long-term disability benefits was not arbitrary and capricious should be upheld for two reasons. First, it is undisputed that an abuse of discretion standard of review applies and that HEDNA was operating under an apparent conflict of interest because it was acting as both the insurer and the claims administrator of the plan at issue. However, appellant has failed to demonstrate that HEDNA engaged in procedural unreasonableness, and HEDNA's decision is therefore entitled to all but a modicum of the deference afforded to an unconflicted administrator. In its initial denial, HEDNA considered all evidence before it, including Dr. Cheatham's medical records, the IME report, plaintiff's self-reported restrictions and limitations, the video surveillance and social media investigation, a peer-reviewed physician report, and Dr. Cheatham's comments to the peer-reviewed physician. HEDNA determined that the clinical evidence in conjunction with appellant's demonstrated functional capabilities failed to support restrictions or limitations that would preclude her from performing a sedentary occupation. Second, HEDNA's decision to terminate appellant's benefits was based on concrete evidence in the record. HEDNA considered the reports and position of appellant's treating physician, Dr. Cheatham, and appellant's self-reports of pain and fatigue, but ultimately relied on the reports of its peer-reviewed physicians and video and social media surveillance, which demonstrated that appellant was able to engage in physical activities contrary to her self-reports to HEDNA. Let me ask you about that. I mean, her condition, as I understand it, she's not saying she's paralyzed, and then we see her walking around, okay, which would be completely inconsistent. Lupus, as I appreciate it, is something that you have good days and bad days. So there could be days that she can walk around or go to Walmart or whatever, and then there's days that she can't even get out of bed. And so that would be consistent with the surveillance, but inconsistent with being able to hold down a regular 40-hour-a-week job as, say, a receptionist or something where they expect you to show up every day. What was shown on the surveillance that calls into question, first, she reported to HEDNA that she never drove, that she was not allowed to drive, that her treating physician told her not to drive. The surveillance shows her driving on two separate days. Additionally, her treating physician consistently over multiple years says she can't bend, she can't turn, she can't grasp. All of these things are demonstrated on the surveillance. Thus, the surveillance calls into question both her treating physician, Dr. Cheatham's physician, as well as her self-reports to HEDNA and her physician, which largely Dr. Cheatham was relying on her self-reports of pain to say she can't do all of these things. But the fact that somebody bends doesn't mean they don't have pain when they bend. I mean, there are things that you would say, I can't do that, and then if you're forced to, if your child's going to die if you don't bend, well, you'll bend, but it's still very, very painful. So, again, I'm having trouble because it seems like Dr. Cheatham's saying she has good days and bad days. There's days she's going to be able to do more than other. I understand about the driving, but the rest of it doesn't seem like he's saying she's paralyzed and completely unable to move her legs, for example, and then all of a sudden she's running in a marathon. This wasn't that, I mean, this wasn't that dramatic. It's not inconsistent with someone who has good days and bad days. Absolutely. However, what Dr. Cheatham did say is she can never bend. She can never twist. She can never do these things. Consistently in his functional capacity, he consistently says she can never do these things. And on the surveillance, if you watch the surveillance, it's clear that she's doing all of these activities with ease and with no apparent pain at all. So do you think this actually is fraud? I mean, she's just actually lying as opposed to this is just an inconsistency among doctors? I believe that there is no question that she has lupus. However, whether she has lupus to such a debilitating level that she can't perform a sedentary occupation. Here, there is concrete evidence in the record that she can perform the duties, the functions that both she and her treating physician were saying she couldn't do. Thus, there's concrete evidence in the record to support that misdetermination. Appellant asserted that the IME report was not provided to Dr. Braun for review. However, Dr. Braun was the first peer review physician. Dr. Braun did reference that IME in his report and commented on the examiner's findings, noting that the examiner did not perform any definitive functional testing, such as lifting, carrying, pushing, or pulling, and that the IME physician's position was, again, based on appellant's self-reports of pain and fatigue. Appellant also asserted that Dr. Braun distorted Dr. Cheatham's notes when he said that appellant had presented without active synovitis, when, in fact, Dr. Cheatham stated that appellant's knees, ankles, and feet did not have a lot of active synovitis. But if you look at Dr. Cheatham's office notes from June 7, 2013, they state that appellant had no active synovitis, and the office notes from August 2, 2013 state that she was without active synovitis on exam. Further, contrary to appellant's assertion, Dr. Braun, Dr. Iyer, and Aetna did consider appellant's self-reports of pain and fatigue as seen throughout their reports. Each report acknowledged the self-reports of pain, but they each questioned the credibility of her self-reports in light of the surveillance and social media posts that showed she was capable of activities contrary to her self-reports, including driving, rotating her neck, reaching with both arms, grabbing, bending, fingering, carrying a large shoulder bag, and walking with a normal gait without the use of any assistive devices, activities all completed without any signs of pain or distress. Additionally, there is concrete support in the administrative record for Aetna's termination of benefits. Aetna conducted a four-month pre-appeal investigation and a four-month post-appeal investigation into appellant's claim. The medical records, surveillance video, social media posts, ALJ determination, and peer reviews all provide support for Aetna's determination that appellant was not disabled under the terms of the plan. The three days of subrosis surveillance of plaintiff's activities were completed on December 30 and 31, 2013, and January 3, 2014. The surveillance tracked appellant for 22 minutes on the 31st and an hour and 47 minutes on the 3rd. During the surveillance on December 31, she drove to a McDonald's drive-thru at 10.45 in the morning. Not only was she driving, which she had reported to Aetna that she did not do only days before, but it also showed her twisting multiple times and handling drinks and a bag of food. On Friday the 3rd, there was an hour and 47 minutes of continual coverage showing a substantial amount of physical activities from noon until 2.45 p.m., and no sign of any restricted body movements or pain. She began with driving to a pharmacy where she waited in the drive-thru lane. During the wait, she talked on her phone, turned and reached into the back seat, twisting, secured her seatbelt, reached down into the back seat again, continued to scroll through and speak on her phone. She drove, sat, and concentrated on driving using her hands and body for a total of 40 minutes. She then drove to City Hall, where she left her vehicle, walked inside at a normal pace with her minor son, carrying a large shoulder bag on her shoulder. When she exited City Hall a few minutes later, she walked back to her car, again at a normal pace, with a normal gait, and without any signs of pain. She was then witnessed driving through two more fast food drive-thrus before she returned home an hour and 47 minutes after departing. Her movements in the surveillance video appear unrestricted, are completed with no apparent discomfort, and contradict Dr. Cheatham's statements that she could never lift, pull, push, hand-grasp, bend, or twist. Additionally, the posts from Appellant's husband's Facebook account during this same period demonstrate the plaintiff was socially and physically active. During a two-month period between June 29, 2013 and August 28, 2013, Appellant's husband checked in on his Facebook page on eight different days at various locations, indicating that he was with Appellant. These locations included the Alamo, SeaWorld San Antonio, a movie theater, a bowling alley, a nightclub, and various restaurants. On June 29, 2013, her husband checked in with Appellant and other individuals at a restaurant called Texas Roadhouse. The very next day, on June 30, 2013, he checked in with Appellant at Raising Cane's restaurant, and then later at the Shark Bar and Grill. On July 13, 2013, he checked in with Appellant at Aquatica San Antonio. The next day, he checked in with Appellant at the Alamo. On July 20, 2013, he checked in with Appellant at 300 Lounge and Bowling Alley, and then later at the Studio Movie Grill and stated that he was with wifey watching The Conjuring. And on August 3, 2013, he checked in with Appellant at Button's restaurant. Finally, on August 23, 2013, he posted that he was with Shonda at Hooters, and then later he posted that wifey and I were at Club Medusa, which is a large Dallas nightclub. These posts show a significant amount of social activity that would likely involve sitting for prolonged periods of time and a significant amount of walking. Both the surveillance and the social media posts indicate discrepancies and inconsistencies in what was self-reported by her appellant regarding her pain and functionality and what Dr. Cheatham reported regarding her functional abilities. Dr. Cheatham consistently maintained that Appellant was permanently disabled and could never walk, reach, sit, bend, stoop. The activities shown in their surveillance and in the social media posts indicate otherwise. The only rebuttal evidence Aetna received regarding the surveillance is a comment from Dr. Cheatham, who advised that Appellant has good days and bad days, and those were her good days. However, this response is problematic. First, this does not address the fact that Appellant was driving and she had told Aetna that she never drove because Dr. Cheatham told her not to. Further, these activities are not isolated days. The surveillance was completed on two separate days, only three days apart, and the social media posts show consistent social activity over a two-month period. Appellant herself never sought to discredit, explain, or give counter-evidence to the surveillance, the posts of her husband, or the claim that she was attending online classes at Northwestern University. She did not supply Aetna with any rebuttal evidence via an affidavit from her, her husband, friends, or family. The only rebuttal evidence on appeal that she provided was an office note from Dr. Cheatham from July 2014, but that note indicates that Appellant had good range of motion, no associated synovitis, and normal chemistries in liver testing in May of 2014. It was noted that Appellant had some markers suggestive of active rheumatologic pathology, but other markers of rheumatologic function were negative. Aetna reviewed and considered this rebuttal evidence and addressed it in its final letter upholding its decision to terminate benefits. Finally, the administrative law judge's decision denying Appellant's appeal seeking Social Security disability benefits also supports Aetna's termination. The administrative law judge's decision is noteworthy as it relates to the credibility of Appellant's self-reporting, which is a seminal issue here. The administrative law judge also questioned Appellant's self-reporting and determined her statements were not credible. He felt her statements were, quote, outside the range of medically reasonable attribution. Given the probing process of the administrative review coupled with the deference owed to Aetna, we believe the record supports the district court's finding that there was no abuse of discretion as there was concrete evidence to support Aetna's decision to terminate benefits. Unless there are any additional questions, I'll rest on my brief. Thank you. Ms. Taylor, you have reserved three minutes for rebuttal. Your Honor, I'd like to address a few of the comments that Appellee's counsel made in her arguments. First, the value of the surveillance and husband's Facebook post evidence. First of all, Aetna attempted surveillance on three days. On one day, they never saw Davis leave her house, and the fact is the two days they actually saw her leave the house were several days apart. Like Dr. Cheatham said, and also Davis told Aetna in several different interviews with her, that some days she can go out and do errands, she can attend school events with her son, and then other days she's bedridden. And like you acknowledged, Dr. Haynes, with lupus you're going to have good days, you're going to have bad days. And what's interesting in Dr. Iyer's report is that he makes a concession that with lupus you would expect Davis to have, you would expect her to have flare-ups of her lupus that would require the imposition of restrictions and limitations. But when he reviewed the surveillance video, he did not make the connection that perhaps the activities she was observed performing, which I believe are not evidence she has no restrictions or limitations, that they could have been done on a good day as opposed to the day where she never left her house that could be a bad day. In addition, counsel made a big point about how the video surveillance doesn't show that Davis was in any pain. It said that she was doing these activities with ease. The comments she made about bending and twisting, those are not the requirements of a sedentary job anyway. It's more prolonged sitting, using your hands for typing, holding a phone. And she also made a point that Davis had the opportunity to rebut the evidence about her attending courses at North Central University or rebutting the evidence on the husband's Facebook post, but Aetna does not mention in either its denial letter or appeal letter that it was relying on that evidence. Davis handled her own appeal, so she did not request her administrative record to prepare her appeal. So she didn't know that Aetna, in fact, relied on it. This Court rendered a decision in a case called Odino v. Raytheon in 2005 that is very similar to this case. There the claimant had rheumatoid arthritis and much of the same evidence that Davis has here, and for the same reasons the Court ruled in the claimant's favor there, the Court should be here as well. Thank you. Thank you, Ms. Taylor.